UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 0:23-cv-61579-WPD

CARLOS ROBERTO,

     Plaintiff,

v.

ADDISON PLACE APARTMENTS PROPERTY
OWNER LLC, JRK RESIDENTIAL GROUP
INC., and, I.Q. DATA INTERNATIONAL INC.,

     Defendants.

_____/

**DEFENDANT I.Q. DATA INTERNATIONAL'S
RESPONSE TO
PLAINTIFF'S MOTION FOR SANCTIONS;
MOTION FOR SANCTIONS AGAINST PLAINTIFF'S ATTORNEY
PURSUANT TO 28 USC §1927 AND THE COURT'S INHERENT AUTHORITY
FOR FILING THIS FRIVOLOUS MOTION;[1]
AND, LOCAL RULE 7.1(a)(3) CERTIFICATION**

DEFENDANT, I.Q. DATA INTERNATIONAL INC. ("IQ DATA"), by and through

undersigned counsel, hereby files this Response to PLAINTIFF'S Motion for Sanctions (docket

entry 126); and, IQ DATA also requests sanctions against PLAINTIFF'S attorney pursuant to 28

USC §1927 and the Court's inherent authority to sanction attorneys for filing this frivolous

motion.  In support of this Response and Motion for Sanctions against PLAINTIFF'S attorney,

IQ DATA states as follows:

---

[1] IQ DATA first filed its Motion for Sanctions against PLAINTIFF on July 19, 2024 (docket entries 115 and 122), exposing this case as a fraud which implicated PLAINTIFF'S attorney. Apparently, PLAINTIFF'S attorney is now angry that he has been exposed and is trying to strike back at IQ DATA and distract the Court from his very own conduct.

# I.  INTRODUCTION

As noted in IQ DATA'S Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Sanctions (docket entry 122), this case involves a fraudulent attempt by PLAINTIFF to fabricate damages (to ultimately use as a down-payment for a home) in a case that involves a "disputed" debt between the CREDITOR and PLAINTIFF – IQ DATA was simply contracted by the CREDITOR to collect this debt.

But, things went seriously wrong for PLAINTIFF when PLAINTIFF'S star witness, MARIA THEROS – who was supposed to testify that PLAINTIFF lost a mortgage or was subjected to higher interest rates because of IQ DATA – testified instead that **PLAINTIFF lied and never wanted a mortgage or loan but was using her to "set-up" or "make" this lawsuit**. Indeed, it went from bad to worse for PLAINTIFF when PLAINTIFF'S star witness implicated PLAINTIFF'S attorney in this fraudulent scheme:

> "cause I gotta give it [the pre-approval letter] to **my lawyer**, send me the pre-approval letter"
>
> "**My lawyer is asking** – asking for that."
>
> "**My lawyer needs it** – **my lawyer needs it.**"
>
> "And what was weird to me was that **the whole repeating question of send me the pre-approval – send me the pre-approval, my lawyer wants it, my lawyer wants it.** My clients don't behave like that."

Now, apparently, in an attempt to deflect or distract the Court from his conduct – or, because he is beginning to panic – PLAINTIFF claims that IQ DATA should be sanctioned.  Thus, PLAINTIFF filed a baseless and frivolous motion riddled with blatant misrepresentations, falsehoods,  and distortions – as will be explained below.  In fact, the bizarre and nonsensical quality of this motion is illustrated by the amount of time and space PLAINTIFF expended complaining that IQ DATA'S corporate representative did not know or refused to tell

PLAINTIFF when IQ DATA first reported the debt as "disputed" to the Credit Reporting Agencies.  **See Motion (docket entry 126), pgs. 2-3, 6-9.**  But, PLAINTIFF was provided this answer on **February 1, 2024** by MICHAEL GULBRANSON in response to PLAINTIFF'S Interrogatories as **May 2023** – perhaps PLAINTIFF forgot? **See IQ DATA'S Answers to Interrogatories, Number 11 (Exhibit 1).**

Accordingly, as explained in detail below, not only should PLAINTIFF'S Motion for Sanctions be denied; but, PLAINTIFF'S attorney should be sanctioned for filing a baseless and frivolous motion filled with misrepresentations simply to distract the Court because he has been implicated in this fraudulent scheme.

## II.  THE MAGISTRATE JUDGE'S ORDER

But, first, PLAINTIFF forgot to tell the Court about the Magistrate Judge's Order regarding IQ DATA'S Motion for a Protective Order.  That is, after PLAINTIFF served a 30(b)(6) notice for the deposition of IQ DATA'S corporate representative, IQ DATA filed a Motion for Protective Order (docket entry 98).  In a nutshell, IQ DATA asserted that virtually all of the identified topics of inquiry were irrelevant to the issues in this case and simply intended to harass IQ DATA.

Magistrate Judge Augustin-Birch held a hearing and issued an Order (docket entry 104). Without having or knowing the particular deposition questions at issue, the Magistrate Judge indicated that "the Court lacks the ability to determine whether and when the questioning might become disproportional."  Consequently, the Court concluded as follows:

> The Court expects the parties to use **good judgment** concerning the scope of questioning and the duration of the depositions.

As explained in detail below, PLAINTIFF'S questions were highly irrelevant and disproportional to the issues in this very basic case, particularly since, as discussed immediately below, **IQ**

**DATA admitted all of the relevant factual allegations** of PLAINTIFF'S Complaint.

### III.  THE NATURE OF THIS CASE

This is a very simple and basic Fair Debt Collection Practices Act ("FDCPA") case involving a debt in the amount of only $1,391 and, as evidenced by IQ DATA'S Motion to Dismiss for Lack of Subject Matter Jurisdiction (docket entry 122), there are no other damages attributable or traceable to IQ DATA.  In the "Factual Allegations" section of the Complaint, there are literally three lines of allegations against IQ DATA:

- CO-DEFENDANTS hired IQ DATA to collect the $1,391 debt;

- IQ DATA called PLAINTIFF to attempt to collect the debt; and,

- IQ DATA reported the debt to the Credit Reporting Agencies.

**See** Complaint (docket entry 1), ¶¶ 22-24.  That is all that is alleged – literally, there are no other allegations against IQ DATA.  In its Answer, IQ DATA **admitted** that it was retained by CO-DEFENDANTS; IQ DATA **admitted** that it telephoned plaintiff to collect the debt; and, IQ DATA **admitted** that it reported the debt as "disputed."  Accordingly, **these factual allegations are not even contested by IQ DATA.**  Consequently, this is a very simple FDCPA case involving only a legal issue – **not a factual issue**:

> Does merely attempting to collect a debt that was sent to IQ DATA by the CREDITOR violate the FDCPA when IQ DATA had no notice before attempting collection that PLAINTIFF was disputing the debt?[2]

Consequently, as discussed in more detail below, the information sought by PLAINTIFF has no relevance to the issues in this case, particularly since **IQ DATA has admitted the factual allegations as framed by PLAINTIFF'S Complaint**.

---

[2]    The Court may recall that IQ DATA filed a Motion for Summary Judgment (docket entry 20) and a Motion to Certify to the Eleventh Circuit (docket entry 73) regarding this very narrow issue.

## IV.  RESPONSE TO PLAINTIFF'S ARGUMENTS

PLAINTIFF'S arguments are rather chaotic and unorganized; but, IQ DATA will do its best to address the issues in the order in which such issues were raised.

### A.   When IQ DATA Reported the Debt as "Disputed" to the CRAs

#### 1.   May 2023 – PLAINTIFF had this Answer since February 1, 2024

First, beginning on page 2 under heading "a," PLAINTIFF appears to complain that IQ DATA'S corporate representative was not prepared to testify on certain issues; but, it appears this boils down to PLAINTIFF'S assertion that IQ DATA did not know when IQ DATA reported the debt as "disputed" to the CRAs, which PLAINTIFF ultimately claims (in the final sentence of this section on page 3) is "**critical** to IQ DATA'S defense that the debt was marked as disputed."

As noted above, however, PLAINTIFF has been in possession of this date since **February 1, 2024** when IQ DATA – via MICHAEL GULBRANSON – responded to PLAINTIFF'S Interrogatories and informed PLAINTIFF that the debt was reported as "disputed" in **May 2023.** **See** **IQ DATA'S Answers to Interrogatories, Number 11 (Exhibit 1).** IQ DATA will again state here that the date of first credit reporting was May 7, 2023, and that the debt was reported as "disputed." Accordingly, this issue is entirely frivolous and harassing; thus, IQ DATA requests sanctions against PLAINTIFF'S attorney.[3]

---

[3] In IQ DATA'S Amended Response to PLAINTIFF'S First Request for Production of Documents, IQ DATA noted that the date was April 7, 2023. **See Response Number 5 (Exhibit 5).** However, consistent with IQ DATA'S Answers to Interrogatories **(Exhibit 1),** it should have been May 7, 2023.  April 7 was the **first** day that IQ DATA spoke with PLAINTIFF; and, that is the day that PLAINTIFF indicated that the debt was **"disputed."** **Thus, that was the day that IQ DATA first marked the debt as "disputed."** Gulbranson Depo. (dated June 28, 2024), **pg. 131 (lines 24-25), 132 (all), 133 (lines 1-10) (Exhibit 3).** Additionally, the May date is clear based on the testimony of MICHAEL GULBRANSON where he indicated that IQ DATA does not credit report for **at least 30 days** after sending the first collection letter, which was **March**

**2.      PLAINTIFF Blatantly Misrepresents the Testimony – All Information is on the "Work Card" but PLAINTIFF Forget to Ask.**

As IQ DATA testified, IQ DATA'S communications with the CRAs are documented on the "Work Card." **See Work Card (Exhibit 2).** As testified:

| | |
|---|---|
| Question: | And you know that topic 13 in the depo notice was all facts leading up to, surrounding or concerning IQ DATA'S reporting the debt at issue to any credit reporting agencies [i.e., CRAs]. That was a topic for today? |
| IQ DATA: | Yes, I felt the **work card** was pretty **clear** about talking about **credit reporting**. |

**Gulbranson Depo. (dated June 28, 2024), pg. 136 (lines 21-25), 137 (line 1) (Exhibit 3).**

Accordingly, the communications between IQ DATA and the CRAs are documented on the Work Card; but, PLAINTIFF stopped scrolling down the Work Card during the deposition[4] and never went back to the questions:

| | |
|---|---|
| Question: | But it doesn't give us one of the most critical parts in this case, which when it was actually reported, correct? |
| IQ DATA: | It might when we go through further in the note card. **We're just up through 4-7 [i.e., April 7].** |
| Queston: | How did IQ DATA report the account onto Mr. Roberto's credit report? |
| IQ DATA: | **Let's scroll down.** * * * |

* * *

---

**22, 2023**. **Gulbranson Depo. (dated June 28, 2024), pg. 136 (lines 5-14) (Exhibit 3).** Consequently, the debt could not have been reported prior to about April 22, 2023, which means the April 7 date cannot be correct.

[4] The deposition was conducted by video. Accordingly, when a document is shared with the deponent via video, only part of the document is visible at any given time. Thus, it is the attorney's responsibility to scroll down the entire document or to scroll to relevant parts of the document to allow the deponent to view such parts of the document. **But, PLAINTIFF'S attorney neglected to do such.**

IQ DATA:        **<u>Then scroll down and find out</u>**. * * *

**Gulbranson Depo. (dated June 28, 2024), pg. 137 (lines 2-22) (<u>Exhibit 3</u>).** The deposition then went off-topic, a break occurred, and, after returning from the break, PLAINTIFF changed the topic of questioning and never when back to questioning about when IQ DATA actually reported the debt as "disputed" to the CRAs. **<u>See</u> Gulbranson Depo. (dated June 28, 2024), pg. 139 (lines 8-22) (<u>Exhibit 3</u>).** Accordingly, PLAINTIFF has no one to blame but himself. As discussed in Footnote 3, if PLAINTIFF had provided IQ DATA with the Answers to the Interrogatories – **<u>which PLAINTIFF had since February 1, 2024</u>** – combined with the information on the Work Card, IQ DATA would have provided the date as May 7, 2023.

        **3.**     **<u>The Metro 2 Information</u>**

Finally, PLAINTIFF mentions the "Metro 2" information. However, the "Metro 2" information is encoded and encrypted and is never printed by IQ DATA in the normal course of business. Thus, **<u>this is a useless document</u>**. As testified by IQ DATA: **<u>"It's a big jumble of data."</u> <u>See</u> Gulbranson Depo. (dated June 28, 2024), pg. 140 (lines 5-23) (<u>Exhibit 3</u>).** For the benefit of the Court, attached as **<u>Exhibit 4</u>** is "Metro 2" information from another case, with the name of the debtor, the address, and the telephone numbers redacted. As evidenced, this is a useless, coded, and encrypted document; thus, it has no relevance to anything.

**B.**     **<u>IQ DATA'S Policies and Procedures</u>**

        **1.**     **<u>Debt Collection Policies and Procedures?</u>**

First, under heading "b" on page 3, PLAINTIFF states that IQ DATA "would not testify about debt collection policies and procedures." PLAINTIFF cites **<u>only</u>** page 36 of the deposition testimony. But, the cited testimony has nothing to do with any IQ DATA policy or procedure; accordingly, it is unclear as to what PLAINTIFF is complaining about. PLAINTIFF may be

complaining about the "legitimacy" of the debt when it was sent to IQ DATA by the CREDITOR; but, as testified by IQ DATA:

> Question:     So how did IQ DATA ensure that the debt being transferred over from JRK was accurate for Mr. Roberto?
>
> IQ DATA:     We rely on our client's information to provide us, per our agreement with them, that the account is accurate and legit when it comes to our office.

**Gulbranson Depo. (dated June 28, 2024), pg. 35 (lines 18-23) (Exhibit 3).**  Again, based on the PLAINTIFF'S citation to page 36 of the deposition, the reason for PLAINTIFF'S argument is simply unknown.

### 2.     **Compliance Policies and Procedures?**

Next, under heading "b" on page 3, PLAINTIFF cites to pages 50 and 51 of the deposition testimony and claims that IQ DATA "provided no competent testimony about the policies and procedures implemented to ensure compliance with its own policies and procedures."  But, **IQ DATA clearly answered this question**:

> Question:     So how does IQ DATA ensure that its employees are following its policies and procedures for onboarding new accounts?
>
> IQ DATA:     **Audits**, **reviews**, **side by side training**, **written training**, **verbal training**, **knowledge between each other as peers**, **information from other employees they have brought to their attention**.

**Gulbranson Depo. (dated June 28, 2024), pg. 50 (lines 4-10) (Exhibit 3).**  Accordingly, why PLAINTIFF is complaining is unknown – again, PLAINTIFF should be sanctioned for this baseless motion.

### 3.     **Physical Location of Policies and Procedures?**

Finally, under heading "b" at the bottom of page 3, PLAINTIFF claims that IQ DATA could not "testify about where IQ DATA employees could find the relevant policies and

procedures aside from a vague reference to a main frame." Once again, however, **PLAINTIFF**

**mispresents the testimony to the Court:**

| | |
|---|---|
| Question: | Where would they go to look in IQ DATA'S system to find out which policy or procedure to apply? |
| IQ DATA: | If they didn't know it by knowledge, doing the job over and over, we do have a database of the procedures and policies that they can go refer to. |
| Question: | And where is that database kept? |
| IQ DATA: | That would be inside of the **Assurance mainframe where – in ARS's allocation of that mainframe** we hold documents. |

\* \* \*

| | |
|---|---|
| Question: | Have you ever opened it up and looked inside to see what policies and procedures are in there? |
| IQ DATA: | I've looked at the policies and procedures numerous times. |
| Question: | So you've accessed the mainframe and looked at the policies and procedures inside of it, correct? |
| IQ DATA: | I've looked at is on paper; I've also looked at them within our system. |

\* \* \*

| | |
|---|---|
| Question: | So if I'm an employee and I need to go find a policy or procedure, how would I be able to go locate a certain policy or procedure inside the system? |
| IQ DATA: | Yes, so like one example would be a **key word search phrase**. |
| Question: | What else? Are there specific file names – go ahead. |
| IQ DATA: | **They know the policy name. They look it up directly**. |

\* \* \*

| | |
|---|---|
| IQ DATA: | **They're named for the subject matter**. |

**Gulbranson Depo. (dated June 28, 2024), pg. 52 (lines 17-25), 53 (all), 54 (lines 1-14)**

(**Exhibit 3**).  Again, the nature of PLAINTIFF'S complaint is unknown considering IQ DATA

answered the questions.[5]

**C.**     **Policies and Procedures for Verifying Debts**

      Next, PLAINTIFF begins under heading "c" by indicating that IQ DATA was required to

provide testimony regarding the **"onboarding"** of new accounts for collection; but, PLAINTIFF

then discusses the policies and procedures for **"verifying the accuracy"** of the debt – **as if the**

**two are the same thing.**  Accordingly, IQ DATA will do its best to address this issue.

      **1.**     **Onboarding and Accuracy**

      Regarding verifying the accuracy of the debt at the time the account arrives at IQ DATA,

IQ DATA provided clear testimony:

| | |
|---|---|
| Question: | All right.  Let's talk about how IQ DATA onboards new accounts. * * * [H]ow does IQ DATA verify that the debts provided by the new client are accurate? |
| IQ DATA: | **We rely on our clients to provide us information, per our agreement with them, that the debts are valid and current at the time of placement.** |

\* \* \*

| | |
|---|---|
| Question: | Does IQ DATA have any policies or procedures to verify whether the debt is accurate while it's – you know, when there's an onboarding of a new account or a new client? |
| IQ DATA: | They have some policies to – we have some **policies that basically look at making sure that information coming across is correct based upon the client's transmission of data to us**. |
| Question: | Can you describe those policies for me, please? |

---

[5]  Incidentally, Magistrate Judge Augustin-Birch held as follows regarding IQ DATA'S
computer system and programs: **The Court "is not convinced that information about [IQ
DATA'S] computer systems and software is relevant to this litigation.**  The Court will permit
[PLAINTIFF] to inquire about the names of [IQ DATA'S] computer systems and software but
will **not permit [PLAINTIFF] to inquire how the computer systems and software function**."
**See** Magistrate Judge Order, docket entry 104, pg. 6.

| | |
|---|---|
| IQ DATA: | **I just did**. |

\* \* \*

| | |
|---|---|
| Question: | So in this case, what policy or procedure was used to verify the accuracy of the debt that JRK provided to IQ DATA? |
| IQ DATA: | Those would be policies that are in our data entry team. |
| Question: | Can you describe those policies for me, please? |
| IQ DATA: | **I did.  They are described as policies to make sure that data being sent in from our clients is accurate based upon the transmission of data.** |
| Question: | So how does IQ DATA verify that it's accurate? |
| IQ DATA: | **They'll spot check balances based upon the data file that they sent over to us, make sure information is matching up with the correct consumers, things of that nature.** |

**Gulbranson Depo. (dated June 28, 2024), pg. 14 (lines 5-25), 15-16 (all) (Exhibit 3).**

Accordingly, it is unknown why PLAINTIFF is complaining, unless he is simply confused, because IQ DATA clearly described the policies and procedures used to confirm the apparent accuracy of the debt upon the onboarding of an account.

**2.     Required Documents**

Next, under heading "c," PLAINTIFF appears to argue that IQ DATA did not testify regarding the documents required to be sent by the client to IQ DATA regarding a new account. But, IQ DATA clearly testified that the documents vary depending on the client:

| | |
|---|---|
| Question: | What documents does IQ DATA require new clients to provide when onboarding new accounts? |
| IQ DATA: | Basically, what we ask for is for **all documents that they have to support the documentation of the debt, including, hopefully, a ledger showing the breakdown of charges**. |
| Question: | So, there's not a list that is given to new clients telling them |

exactly what documents need to be provided?

IQ DATA:       No.

* * *

Question:      What kind of document would need to be in the account?

IQ DATA:       **It depends on the situation.**

Question:      Is there a list of documents that IQ DATA can look at, that an employee of IQ DATA can look at to determine if a document is missing from a client?

IQ DATA:       Once again, **you're asking questions like every account is the same.  Every account has their own nuance.**

**Gulbranson Depo. (dated June 28, 2024), pg. 19 (lines 16-25), 20-21 (all), 22 (lines 1-15)**

**(Exhibit 3).**   Again, it is unknown why PLAINTIFF is complaining since IQ DATA clearly testified that IQ DATA requires documentation supporting the amount of the debt and hopefully a breakdown of all components of the debt; beyond that, it depends on the nuances and circumstances of each particular account.   **The topic was fully answered.**

**D.      Verifying the Accuracy of PLAINTIFF'S Debt**

**1.      PLAINTIFF'S Debt**

Next, under heading "d," PLAINTIFF appears to be complaining that IQ DATA did not provide testimony regarding how it verified the accuracy of PLAINTIFF'S debt.   But, PLAINTIFF again appears confused because IQ DATA clearly testified as follows on such topic:

Question:      So how did IQ DATA ensure that the debt being transferred over **from JRK was accurate for Mr. Roberto?**

IQ DATA:       We rely on our client's information to provide us, per our agreement with them, that the account is accurate and legit when it comes to our office.

**Gulbranson Depo. pg. 35 (lines 18-23) (Exhibit 3);**

| Question: | So in [PLAINTIFF'S] case, **what steps did IQ DATA take to investigate the legitimacy of the debt?** |
|---|---|
| IQ DATA: | Basically, on that account what my recollection is, is that **we went through our normal bankruptcy and service member scrubs, and some employees reviewed the account and some employees tried to contact Mr. – well your client regarding the account.** |
| Question: | Other than what you just described, did those employees do anything else to try and verify whether the debt was legitimate? |
| IQ DATA: | **Yes, we tried to reach back out to your client to get more information.** |

**Gulbranson Depo. pg. 42 (lines 16-25), 43 (lines 1-6) (Exhibit 3).**  Again, the topic was fully

answered.[6]

### 2.    Discussion with other IQ DATA Employees

PLAINTIFF also appears to be upset because IQ DATA spoke to no employees that

worked on PLAINTIFF'S account.  But, as explained by IQ DATA, IQ DATA can receive up to

10,000 new accounts in one month and no employee will be able to recollect distant events as to

any particular account:

| Question: | So it would be helpful to talk to that employee to know what compliance procedure was followed, correct? |
|---|---|
| IQ DATA: | I kind of doubt it though, because they work hundreds of accounts, so you know, I mean to remember something that they did four months ago, I don't think any human could do that. |

**Gulbranson Depo. pg. 48 (lines 23-25), 49 (lines 1-4) (Exhibit 3).**  Furthermore, this is why IQ

DATA has the "Work Card" **(Exhibit 2),** which documents all activity on the account:

| Question: | Well, that person would be the best person to ask.  No one else would know that they did, right, other than looking at the work |
|---|---|

---

[6]  **PLAINTIFF attempts to deceive the Court on this issue**. Notice, under heading "d," PLAINTIFF does not cite the Court to any testimony beyond page 41; **but, the testimony on this topic extends to pages 42 and 43 where it is fully answered.**

card?

IQ DATA:       **That's why we have a work card**.

**Gulbranson Depo. pg. 49 (lines 20-23) (<u>Exhibit 3</u>).**

**E.       <u>Once Again, Credit Reporting – which has No Relevance to this Case</u>[7]**

Under heading "e," PLAINTIFF again complains about IQ DATA'S testimony regarding

credit reporting – which has all been discussed above.  Nevertheless, PLAINTIFF claims that IQ

DATA could not "provide the specific steps taken by IQ DATA to verify the accuracy of the

debt purportedly owed by [PLAINTIFF] prior to him disputing its validity."  But, PLAINTIFF

forgot to tell the Court about the following testimony:

Question:       So in [PLAINTIFF'S] case, **what steps did IQ DATA take to**
                **investigate the legitimacy of the debt?**

IQ DATA:        Basically, on that account what my recollection is, is that **we went**
                **through our normal bankruptcy and service member scrubs,**
                **and some employees reviewed the account and some employees**
                **tried to contact Mr. – well your client regarding the account.**

Question:       Other than what you just described, did those employees do
                anything else to try and verify whether the debt was legitimate?

IQ DATA:        **Yes, we tried to reach back out to your client to get more**
                **information.**

**Gulbranson Depo. pg. 42 (lines 16-25), 43 (lines 1-6) (<u>Exhibit 3</u>).**  Accordingly, PLAINTIFF

should be sanctioned for attempting to deceive the Court.

Next, PLAINTIFF claims that IQ DATA "could not provide testimony regarding when

IQ DATA began to report the debt on [PLAINTIFF'S] credit report." But, again, as discussed

---

[7] This is not a case under the FCRA ("Fair Credit Reporting Act").  Rather, it is an FDCPA case;
accordingly, IQ DATA'S credit reporting has no relevance whatsoever to the claim against it
under the FDCPA.  Indeed, as noted by IQ DATA'S counsel during the deposition, questions
concerning the FCRA are **beyond the scope** of the **notice** of this deposition. **Gulbranson Depo.
pg. 67 (lines 19-25), 68 (all), 69 (lines 1-16) (<u>Exhibit 3</u>).**

14

above, **PLAINTIFF conveniently forgot to tell the Court that he has had this information since February 1, 2024 – it was first reported in May 2023**. See **IQ DATA'S Answers to Interrogatories, Number 11 (Exhibit 1); see also Footnote 3, above.**

Finally, PLAINTIFF claims that IQ DATA could not even testify as to which CRA it reported the debt. However, IQ DATA clearly testified that it intends to report to all three CRAs – i.e., TransUnion, Experian, and Equifax – but, whether that happened in this particular case was unknown at that time. **Gulbranson Depo. pg. 139 (lines 3-7) (Exhibit 3).** But, as set forth in IQ DATA'S Answer, IQ DATA had already admitted that it reported the debt on PLAINTIFF'S credit report. **See Answer (docket entry 11), ¶24.** Accordingly, this information has no relevance to this case.

## V. CONCLUSION

PLAINTIFF'S attorney has been implicated – via the testimony of PLAINTIFF'S non-party star witness MARIA THEROS – in a fraudulent attempt to create damages in this case. Now, PLAINTIFF is apparently trying to distract the Court from his very own conduct by filing this frivolous Motion for Sanctions. Indeed, there are **no factual issues at dispute** in this case as IQ DATA has **admitted** all of the relevant factual allegations of PLAINTIFF'S Complaint long ago. Accordingly, virtually the entire deposition of IQ DATA'S corporate representative was **irrelevant** to the issues of this case – this deposition was designed simply to harass IQ DATA. Moreover, Magistrate Judge Augustin-Birch instructed the parties to use their best judgment regarding the topics of the deposition. As outlined above, IQ DATA answered all questions at the deposition. Accordingly, PLAINTIFF should be sanctioned for filing this frivolous and baseless Motion for Sanctions.

WHEREFORE, IQ DATA requests the denial of PLAINTIFF'S Motion for Sanctions and the granting of IQ DATA'S Motion for Sanctions against PLAINTIFF'S attorney.

## LOCAL RULE 7.1(a)(3) CERTIFICATION

Pursuant to Local Rule 7.1(a)(3), Counsel for IQ DATA, Douglas A. Kahle, had a telephone call with Counsel for PLAINTIF, Josh Feygin, on August 5, 2024, but the parties could not reach an agreement regarding these Motions.

**Dated: August 9, 2024**                    Respectfully submitted,

*/s/ Douglas A. Kahle*
Douglas A. Kahle, Esq.
Florida Bar No.: 0141194
E-Mail: dkahle@schwedpa.com
SCHWED KAHLE & KRESS, P.A.
11390 North Jog Road, Suite 102
Palm Beach Gardens, FL 33418
Phone: (561) 694-0070
Fax: (561) 694-0057
*Attorneys for IQ Data International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on **August 9, 2024**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Douglas A. Kahle*
Douglas A. Kahle, Esq.
Florida Bar No.: 0141194
E-Mail: dkahle@schwedpa.com

16

## SERVICE LIST

Joshua E. Feygin, Esq.
Joshua Feygin, PLLC
1800 E. Hallandale Bch. Blvd. #85293
Hallandale Beach, FL 33009
Phone: 954-228-5674
Email: josh@jfeyginesq.com

Darren R. Newhart, Esq.
Newhart Legal, P.A.
14611 Southern Blvd. Suite 1351
Loxahatchee, FL 33470
Phone: 561-331-1806
Email: darren@newhartlegal.com

*Counsel for Plaintiff*

Walter J. Taché, Esq.
Alyssa M. Altonaga, Esq.
Tache, Bronis and Descalzo, P.A.
150 S.E. 2 Avenue, Suite 600
Miami, Florida 33131
Phone: (305) 537-9565 Fax: (305) 537-9567
wtache@tachebronis.com
aaltonaga@tachebronis.com
service@tachebronis.com

*Counsel for Addison Place Apartments Property Owner, LLC
and JRK Residential Group, Inc.*

Via CM/ECF