UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:23-CV-61579-DIMITROULEAS/AUGUSTIN-BIRCH

CARLOS ROBERTO,

    **Plaintiff,**

v.

ADDISON PLACE APARTMENTS PROPERTY
OWNER LLC, *et al.*,

    **Defendants.**

_____/

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SANCTIONS [DE 126]

This cause comes before the Court on Plaintiff Carlos Roberto's Motion for Sanctions. DE 126. Defendant I.Q. Data International, Inc. filed a response, DE 132, and Plaintiff filed a reply. DE 146. Having carefully considered the briefing and the record and being otherwise fully advised, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Sanctions [DE 126].

### I. Background

Upon moving into his apartment, Plaintiff allegedly noticed pre-existing damage, which he purports to have documented in an "inventory and condition report." DE 1 ¶ 10. When it came time to vacate his apartment, Plaintiff claims to have thoroughly cleaned and made "material improvements" to his apartment. *Id.* ¶ 17. Despite these efforts, Defendants Addison Place Apartment Property Owner LLC and JRK Residential Group, Inc. ("Addison and JRK") purportedly both retained Plaintiff's security deposit and charged $1,391 to Plaintiff's account. *Id.* ¶ 20. After Plaintiff refused to pay the $1,391, Addison and JRK employed Defendant I.Q. Data International, Inc. ("IQ Data") to collect the alleged debt from Plaintiff. *Id.* ¶ 22. Thereafter, IQ Data allegedly called Plaintiff

to attempt to collect the alleged debt and also listed the alleged debt on Plaintiff's credit report. *Id.* ¶¶ 23–24.

As part of the discovery in this case, Plaintiff noticed a Federal Rule of Civil Procedure 30(b)(6) deposition of IQ Data's corporate representative. DE 98-1. In response, IQ Data moved for a protective order, barring Plaintiff from deposing its corporate representative regarding certain areas of inquiry identified in the deposition notice. DE 98. This Court granted in part and denied in part IQ Data's motion, ruling that Plaintiff could inquire into all areas of inquiry except for area of inquiry #5, which concerned the system or software IQ Data used when attempting to collect the alleged debt from Plaintiff. DE 104 at 6; DE 98-1 at 5. Additionally, the Court expressed its expectations for the parties to use good judgment concerning the scope of questioning and the duration of the deposition so that the deposition would not "surpass[] what is proportional to the needs of this case." DE 104 at 5.

After the deposition of IQ Data's corporate representative, Plaintiff filed the present Motion for Sanctions, contending that IQ Data's corporate representative was unprepared to testify about certain topics and that the deposition revealed that IQ Data withheld discoverable information. DE 126. As a result, Plaintiff requests for the Court to prevent IQ Data "from presenting any argument, evidence, testimony or facts relating to the[] unanswered areas of inquiry" and "its communications with any credit reporting agency or bureau." *Id.* at 9. In its response, IQ Data contends that Plaintiff's Motion for Sanctions is baseless and moves for sanctions against Plaintiff for the filing of what it contends is a frivolous motion. DE 132 at 15–16.

**II. IQ Data Failed to Disclose its Communications with the Credit Reporting Agencies**

Plaintiff contends that IQ Data should be sanctioned for its failure to disclose its communications with the credit reporting agencies. DE 126 at 3. Specifically, Plaintiff notes that it requested for IQ Data to produce "all documents . . . sent to or retrieved from any credit bureau and/or

credit reporting agency regarding the Plaintiff or the Debt,"[1] and IQ Data responded that there were no documents and did not raise any objections. *Id.* at 2; DE 126-2 at 2 (Request for Production #5).[2] However, at the deposition of IQ Data's corporate representative, the corporate representative testified that IQ Data communicates with the credit reporting agencies via the "Metro 2" format. DE 126-3 at 140:5–11 (answer from IQ Data's corporate representative that IQ Data uploads information to credit reporting agencies through the "Metro 2 format" in response to a question as to what medium IQ Data communicated with the credit reporting agencies about Plaintiff). As for the prejudice this failure to disclose has caused him, Plaintiff claims that IQ Data's failure to disclose its communications with the credit reporting agencies has prejudiced him because he does not have documentation to show when IQ Data first reported the alleged debt or when IQ Data reported the debt as disputed. DE 126 at 9.

    IQ Data responds that Plaintiff has been in possession of this information since it responded to his Interrogatories. DE 132 at 5. In particular, IQ Data claims that the alleged debt was reported as disputed in May 2023, as it indicated in a response to one of Plaintiff's Interrogatories. *Id.*; *see also* DE 132-1 at 7 ("The debt was reported as 'disputed' in May 2023."). This response, however, does not answer the question as to when IQ Data first reported the alleged debt and whether it first reported the debt as disputed or undisputed. IQ Data also asserts that Plaintiff could have obtained information regarding when it first reported the alleged debt and whether it reported the alleged debt as disputed or undisputed if he had only further inquired from its corporate representative. DE 132 at 6–7. But the Court fails to see how this excuses IQ Data's failure to disclose its communications with the credit

---

[1] Plaintiff's Requests for Production defined "documents" as meaning "any writing, drawing, graph, chart, photograph, sound recording, image, other data or data compilations, or any form of expression, stored in any medium from which information can be obtained either directly or indirectly, or, if necessary, after translation by the responding party into a reasonably useful form," including electronically stored information. DE 126-1 at 2.

[2] IQ Data amended its response roughly six months later to include an objection to Plaintiff's Request for Production #5. *See* DE 126-4 at 3. But since IQ Data untimely raised this objection, the objection was waived. S.D. Fla. L.R. 26.1(e)(2)(A) (noting that any objection not raised to a request for production within the time allotted by the Federal Rules of Civil Procedure shall be waived).

3

reporting agencies. Lastly, IQ Data contends the information in the Metro 2 format is "useless" because it is an encoded and encrypted "jumble of data." *Id.* at 7. However, IQ Data raises no argument that the information in the Metro 2 format could not be decoded or decrypted so that Plaintiff could comprehend the information.

Accordingly, the Court finds that IQ Data failed to disclose to Plaintiff the information in the Metro 2 format, which comprises its communications with the credit reporting agencies and bureaus. As a result, and pursuant to Federal Rule of Civil Procedure 37(c)(1), IQ Data shall not be allowed to use as evidence on any motion or at any hearing or at trial any document, as defined by Plaintiff's Requests for Production, that IQ Data sent to any credit bureau and/or credit reporting agency via the Metro 2 format regarding Plaintiff or the alleged debt. *See* Fed. R. Civ. P. 37(c)(1) (prohibiting party from using information "to supply evidence on a motion, at a hearing, or a trial" when that party fails to provide the information as required by Rule 26(a) or (e)"). To be clear, the Court does not go so far as Plaintiff requests to exclude any argument, evidence, testimony, or facts relating to any communications with credit bureaus and credit reporting agencies. Instead, IQ Data shall only not be permitted to use as evidence the documents, as defined by Plaintiff's Requests for Production, it sent to any credit bureau and/or credit reporting agency via the Metro 2 format regarding Plaintiff or the alleged debt.

### III. Rule 30(b)(6) Standard

Federal Rule of Civil Procedure 30(b)(6) "obligates the responding corporation to provide a [corporate representative] who can answer questions regarding the subject matter listed in the notice." *King v. Pratt & Whitney*, 161 F.R.D. 475, 476 (S.D. Fla. 1995). "If the [corporate representative] is not able to answer questions regarding the subject matter he was designated to testify about, the corporation has failed to satisfy its obligation to prepare the [corporate representative] and may be subject to sanctions." *Fuentes v. Classica Cruise Operator Ltd*, 32 F.4th 1311, 1322 (11th Cir. 2022).

Nonetheless, "a Rule 30(b)(6) deposition is not a memory test" and "absolute perfection is not required" of a corporate representative. *Id.* (quotation marks and alteration omitted). "Accordingly, the fact that a [corporate representative] could not answer every question on a certain topic does not necessarily mean that the corporation failed to comply with" Rule 30(b)(6). *Id.* (quotation marks omitted); *see also Lebron v. Royal Caribbean Cruises, Ltd.*, No. 16-24687-CIV, 2018 WL 4258269, at *3 (S.D. Fla. Sept. 6, 2018) ("[A]lthough a Rule 30(b)(6) witness who fails to give meaningful testimony about the majority of relevant deposition topics is tantamount to no witness at all, the mere fact that a [corporate representative] could not answer every question on a certain topic does not necessarily mean that the corporation failed to comply with its obligation." (citation omitted)).

## IV. Analysis

Plaintiff contends that IQ Data failed to produce a corporate representative that was prepared to testify about five Topics of Inquiry. DE 126 at 3–6 (claiming IQ Data's corporate representative was not prepared to testify as to Topics of Inquiry 29, 5, 12, 2, and 13). The Court will address each Topic of Inquiry in turn. Ultimately, Plaintiff's arguments are without merit.

### A. Topic of Inquiry 29

Topic 29 of Plaintiff's Rule 30(b)(6) deposition notice sought testimony from IQ Data's corporate representative concerning "IQ Data's policies and procedures as it relates to debt collection, including any oral or written policies and procedures provided to employees or representatives of Defendant, when a consumer has not disputed the debt." DE 126-5 at 6. Plaintiff contends that IQ Data's corporate representative was unprepared to testify as to Topic 29 because he: (1) "would not testify about debt collection policies and procedures," (2) "provided no competent testimony about the policies and procedures implemented to ensure compliance with its own policies and procedures," and (3) could not testify "about where IQ Data employees could find the relevant policies and

procedures aside from vague references to a 'main frame.'" DE 126 at 3. The Court cannot agree with these characterizations of the testimony from IQ Data's corporate representative.

First, IQ Data's corporate representative provided meaningful testimony concerning IQ Data's debt-collection policies and procedures. For example, IQ Data's corporate representative provided the following testimony:

> **Question:** All right. Let's talk about how IQ Data onboards new accounts. So when IQ Data is onboarding a new account -- or excuse me, not a new account, but onboarding an account for a client, how does IQ Data verify that the debts provided by the new client are accurate?
>
> **Answer:** We rely on our clients to provide us information, per our agreement with them, that the debts are valid and correct at the time of placement.
>
> . . . .
>
> **Question:** Does IQ Data have any policies or procedures to verify whether the debt is accurate while it's --you know, when there's an onboarding of a new account or a new client?
>
> **Answer:** They have some policies to -- we have some policies that basically look at making sure that information coming across is correct based upon the client's transmission of data to us.

DE 126-3 at 14:5–13, 14:21–25, 15:1–4. Later on, IQ Data's corporate representative expounded upon these policies:

> **Question:** So in this case, what policy or procedure was used to verify the accuracy of the debt that JRK provided to IQ Data?
>
> **Answer:** Those would be policies that are in our data entry team.
>
> **Question:** Can you describe those policies for me, please?
>
> **Answer:** I did. They are described as policies to make sure that data being sent in from our clients is accurate based upon the transmission of data.
>
> **Question:** So how does IQ Data verify that it's accurate?
>
> **Answer:** They'll spot check balances based upon the data file that they sent over to us, make sure information is matching up with the correct consumers, things of that nature.

6

*Id.* at 16:10–25.

Second, IQ Data's corporate representative provided testimony about how IQ Data's employees implement these policies and procedures:

> **Question:** Does IQ Data have any policies or procedures to ensure that accurate information is provided to the credit reporting agencies?
>
> **Answer:** Yes.
>
> **Question:** Can you describe those policies and procedures for me, please?
>
> **Answer:** Yes, they're policies on the Fair Credit Reporting Act.
>
> **Question:** So how would someone, an employee for IQ Data, follow the policy and procedure that you just said?
>
> **Answer:** They would be trained on the policy, shown to work on the policy and have follow-up reading, reviewing.

*Id.* at 64:10–23. Additionally, IQ Data's corporate representative explained that IQ Data ensures that its employees follow its policies and procedures via: "Audits, reviews, side by side training, written training, verbal training, knowledge between each other as peers, information from other employees they have brought to their attention." *Id.* at 50:7–10.

Lastly, IQ Data's corporate representative provided testimony as to where IQ Data's employees could find relevant policies and procedures:

> **Question:** Where would they go to look in IQ Data's system to find out which policy or procedure to apply?
>
> **Answer:** If they didn't know it by knowledge, doing the job over and over, we do have a database of the procedures and policies that they can go refer to.
>
> **Question:** And where is that database kept?
>
> **Answer:** That would be inside of the Assurance mainframe where -- in ARS's allocation of that mainframe where we hold documents.

*Id.* at 52:17–25. IQ Data's corporate representative also provided specifics as to how an employee could locate policies or procedures within that system:

7

>   **Question:** So if I'm an employee and I need to go find a policy or procedure, how would I be able to go locate a certain policy or procedure inside the system?
>
>   **Answer:** Yes, so like one example would be key word search phrases.
>
>   **Question:** What else? Are there specific file names -- go ahead.
>
>   **Answer:** They know the policy name. They look it up directly.
>
>   **Question:** How are the policies named within the system?
>
>   **Answer:** How are they named?
>
>   **Question:** Correct.
>
>   **Answer:** They're named for the subject matter.
>
>   **Question:** How many different subject matters are there?
>
>   **Answer:** I cannot answer that question. A lot.
>
>   **Question:** Can you describe some of the subject matters for me?
>
>   **Answer:** Sure. Disputes, fraud, bankruptcies, account efforts, letters. I mean everything that would have to do with the working of a collection agency, there's a procedure about it.

*Id.* at 54:2–22. Accordingly, the Court finds that IQ Data's corporate representative provided meaningful and sufficient testimony as to Topic 29.

### B. Topic of Inquiry 5

Topic 5 of Plaintiff's Rule 30(b)(6) deposition notice sought testimony from IQ Data's corporate representative relating to "IQ Data's policies and procedures for onboarding new accounts for collection." DE 126-5 at 4. Plaintiff argues that IQ Data's corporate representative was unprepared to testify as to Topic 5 because he "could provide no competent testimony regarding the names of any relevant policies nor was he capable of describing the policies with any sort of specificity." DE 126 at 4. Plaintiff also maintains that IQ Data's corporate representative was "incapable of describing with any sort of particularity the specific documents IQ Data requires to confirm the accuracy of debts

8

it takes on for collection." *Id.* The Court disagrees and finds that IQ Data's corporate representative provided meaningful and sufficient testimony as to Topic 5.

First, as explained above, IQ Data's corporate representative testified at length regarding IQ Data's policies and procedures for onboarding new accounts. Second, as previously stated, "a Rule 30(b)(6) deposition is not a memory test" and "absolute perfection is not required" of a corporate representative. *Fuentes*, 32 F.4th at 1322. Therefore, the inability of IQ Data's corporate representative to recall the names of specific policies does not mean IQ Data's corporate representative was unprepared to testify as to Topic 5. *See* DE 126-3 at 15:11–12 (answer from IQ Data's corporate representative that he did not "have the names of the policies memorized" because IQ Data has "hundreds" of policies); *see also id.* at 17:9–10 ("As stated before, I don't have all the names of the policies memorized. There's [sic] hundreds of them."). Moreover, Plaintiff has failed to explain to the Court the significance or relevance of the actual names of IQ Data's policies.

Lastly, IQ Data's corporate representative testified that it is case specific as to which policies and software IQ Data utilizes and what documents it requires for an account:

> **Question:** So can you describe to me the procedure that IQ Data's employee would follow to verify the accuracy of the debt when it onboards a new client?
>
> **Answer:** No, actually, there's [sic] numbers of methods based upon different integrations with different softwares.
>
> **Question:** So can you describe the differences for me?
>
> **Answer:** That, the differences are based upon different aspects of the different softwares, so I don't really know what you're looking for there.
>
> **Question:** So what softwares apply to what onboarding procedure?
>
> **Answer:** What softwares? I don't understand your question.
>
> **Question:** Well, you're saying that for each policy and procedure -- or excuse me. That the policies and procedures are different for each software that is utilized. Is that correct?
>
> **Answer:** No, there's different nuances for different software.

9

. . . .

**Question:** So let's talk about onboarding. Is there a policy or procedure that they can look at to know whether a certain document is missing when an account is being onboarded for a new client?

**Answer:** There's not a requirement that every single document has to be inside as listed, so no.

**Question:** What are the basic documents that IQ Data needs when onboarding a new account to start the collection process?

**Answer:** That's depending upon each individual account.

**Question:** What about in this case, what was the basic documentation that IQ Data needed in order to start collecting on the account?

**Answer:** I think the basic information that was provided that gave us confidence, and it was the breakdown in charges.

**Question:** So IQ Data had confidence that the information was accurate based on the charges, the itemization of charges?

**Answer:** And our clients giving us the account per our agreement.

**Question:** So giving the account per the agreement and also the itemization of charges. Anything else?

**Answer:** Each account is individual, so –

**Question:** How does IQ Data ensure that it does not onboard and report inaccurate debts to credit reporting agencies?

**Answer:** That question, once again, is too general to ask. It depends on each case scenario. We cannot treat accounts like they're just batches of accounts. We treat each account as its own individual situation.

*Id.* at 15:15–25, 16:1–9, 22:21–25, 23:1–25, 24:1–2. Given these explanations, the onus was on Plaintiff to ask for greater specificity or clarification regarding a particular policy. And, at least with respect to the portions of the deposition transcript Plaintiff has cited for the Court, *see* DE 126 at 4–5, Plaintiff never asked for greater specificity or clarification that IQ Data's corporate representative

10

could not provide, save for the actual names of the policies. Consequently, the Court finds that IQ Data's corporate representative was not unprepared to testify about Topic 5.

### C. Topic of Inquiry 12

Topic 12 of Plaintiff's Rule 30(b)(6) deposition notice sought testimony from IQ Data's corporate representative regarding "[a]ll facts leading up to, surrounding, or concerning any investigation performed by IQ Data into the validity of the debt at issue here." DE 126-5 at 4. Plaintiff maintains that IQ Data's corporate representative was unprepared to testify as to Topic 12 because his answers were "evasive and non-responsive." DE 126 at 5. However, IQ Data's corporate representative directly testified about the steps IQ Data took to investigate the legitimacy of Plaintiff's alleged debt:

> **Question:** So in Mr. Roberto's case, what steps did IQ Data take to investigate the legitimacy of the debt?
>
> . . . .
>
> **Answer:** Basically, on that account what my recollection is, is that we went through our normal bankruptcy and service member scrubs, and some employees reviewed the account and some employees tried to contact Mr. -- well, your client regarding the account.
>
> **Question:** Other than what you just described, did those employees do anything else to try and verify whether the debt was legitimate?
>
> . . . .
>
> **Answer:** Yes, we tried to reach back out to your client to get more information.
>
> **Question:** And the steps that the employees were taking, were they following IQ Data policies and procedures?
>
> **Answer:** Yes, I believe so.

DE 126-3 at 42:16–24, 43:1–10. Notably, Plaintiff does not include any citation to this testimony or include any argument as to why this testimony was insufficient. *See* DE 126 at 5; DE 146 at 6. The

Court finds that IQ Data's corporate representative provided sufficient and meaningful testimony regarding Topic 12.

### D. Topics of Inquiry 2 and 13

Topic 2 of Plaintiff's Rule 30(b)(6) deposition notice sought testimony concerning "IQ Data's policies and procedures for reporting negative credit information about consumers to credit reporting agencies," and Topic 13 sought testimony regarding "[a]ll facts leading up to, surrounding, or concerning IQ Data's reporting the debt at issue here to any credit reporting agencies." DE 126-5 at 3–4. Plaintiff argues that IQ Data's corporate representative was unprepared to testify as to these Topics, claiming IQ Data's corporate representative could not provide testimony as to: (1) the specific steps IQ Data took to verify the accuracy of the debt Plaintiff purportedly owed, (2) when IQ Data began to report the debt to Plaintiff's credit report, and (3) which credit reporting agencies it reported Plaintiff's alleged debt to. DE 126 at 6.

First, as explained above, IQ Data's corporate representative testified about the steps IQ Data took to verify the accuracy of the debt Plaintiff purportedly owed. *See* DE 126-3 at 42:16–24, 43:1–10. Second, regarding when IQ Data began to report the debt on Plaintiff's credit report, IQ Data already provided this answer in response to Plaintiff's Interrogatory # 11. *See* DE 132-1 at 7 ("The debt was reported as 'disputed' in May 2023."). Lastly, Plaintiff is correct that IQ Data's corporate representative did not know which of the credit reporting agencies IQ Data reported the debt to:

> **Question:** Do you know which credit reporting agencies that IQ Data reported the debt to?
>
> **Answer:** I know of the three that we intend to always report on, but whether it was all three, I don't know.

DE 126-3 at 139:3–7. However, the Court finds that this one inability to provide an answer does not warrant sanctions. *See Lebron*, 2018 WL 4258269, at *3 ("[A]lthough a Rule 30(b)(6) witness who fails to give meaningful testimony about the majority of relevant deposition topics is tantamount to

no witness at all, the mere fact that a [corporate representative] could not answer every question on a certain topic does not necessarily mean that the corporation failed to comply with its obligation." (citation omitted)). Accordingly, the Court finds that IQ Data's corporate representative provided meaningful and sufficient testimony for Topics 2 and 13.

### V. IQ Data's Request for Sanctions

Contending that Plaintiff's Motion for Sanctions is frivolous, IQ Data includes its own motion for sanctions in its response to Plaintiff's Motion, requesting sanctions pursuant to 28 U.S.C. § 1927 and the Court's inherent authority. DE 132. As an initial matter, it is improper to embed a motion within a response to a motion. *See Waterfront ICW Props., LLC v. Town of Ocean Ridge*, No. 21-81241-CV, 2021 WL 8442616, at *2 (S.D. Fla. Dec. 2, 2021). And, in any event, the Court finds that sanctions against Plaintiff are not warranted here, seeing as the Court has found some merit to Plaintiff's Motion for Sanctions and is awarding Plaintiff some relief. As such, the Court denies IQ Data's request for sanctions.

### VI. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Sanctions [DE 126].

**DONE AND SUBMITTED** in Chambers at Fort Lauderdale, Florida, this 6th day of November, 2024.

_____
PANAYOTTA AUGUSTIN-BIRCH
UNITED STATES MAGISTRATE JUDGE